[Cite as *State v. Truesdell*, 2024-Ohio-5376.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230671 |
| | | TRIAL NO. B-2100429 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| CHARLES TRUESDELL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: November 13, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Roger W. Kirk* for Defendant-Appellant.

**WINKLER, Judge.**

{¶1}   Following a jury trial, defendant-appellant Charles Truesdell was convicted of six counts of gross sexual imposition under R.C. 2907.05(A)(4). Truesdell was originally indicted on four counts of rape and six counts of gross sexual imposition. He was acquitted on the four rape counts. The trial court imposed the maximum sentence on each count, to be served consecutively to each other, for a total of 360 months in prison. Truesdell now appeals those convictions, raising eight assignments of error. We find no merit in his assignments of error, and we affirm his convictions.

## I.  Factual Background

{¶2}   The evidence presented at a jury trial showed that Truesdell was the victim's uncle. The charged offenses occurred between 2007 and 2011, when the victim was between six and ten years old. She was 22 years old when she testified at the trial.

{¶3}   The first time the victim had a sexual encounter with Truesdell, she was at her grandmother's house in Norwood. She was lying under Truesdell's computer desk, pretending to be a dog, when Truesdell "got his penis out and started masturbating with my face like – because I was sitting under the desk. So like right in front of me." She believed that Truesdell knew she was under the desk at that time.

{¶4}   After Truesdell's wife died in 2007, he and his daughter, G.M., stayed with the victim's family in their Loveland home. G.M. lived full time with the victim's family. Though Truesdell would usually stay somewhere else, he would sometimes spend the night when he had been drinking.

{¶5}   The victim said the first time she remembered something happening at the family's house in Loveland was an incident in an above-ground pool in the

2

backyard that Truesdell had given the family. The victim's mother asked him to watch her in the pool, and he got into the pool with her. Truesdell began masturbating in the pool. When the victim asked him what he was doing, he replied that he was giving himself a massage. Then he asked the victim if she wanted to massage him. When the victim hesitated, he grabbed her hand and put it on his penis and guided her to masturbate him to ejaculation.

{¶6} While G.M. lived with the family, Truesdell would frequently visit on weekends. Truesdell was friends with the victim's father, and they would go drinking or to a casino, although the victim did not know if the casino was in Ohio or Indiana. The victim said that when the two men came home drunk, her dad would go to his room, but Truesdell would stay in the living room. Truesdell would take the victim into the bathroom, where she would touch his penis until he ejaculated, and he would touch her. They used the code word "massages" to describe their activities.

{¶7} The victim testified that at the time of these incidents, she was young enough not to "know what a penis was." She described an incident where she was touching Truesdell's penis and asked him whether it was "like her pet," and Truesdell laughed and said, "[I]t could be whatever you want it to be." In another bathroom encounter, the victim said that she was sitting on the toilet, facing the water tank of the toilet, and Truesdell was rubbing his penis up and down on her back. She asked him to stop because she did not want him to ejaculate on her back. Truesdell tried to "initiate oral sex," but she declined because she did not want him to ejaculate in her mouth. As a compromise, she would lick her hand and then she would "jack him off."

{¶8} Additionally, the victim testified that the sexual-abuse incidents in the bathroom occurred over a long period time, and totaled more than ten times. In fact, the sexual activities became so routine that when Truesdell returned from the casino, she knew to meet him in the bathroom. She described how Truesdell would buy her

3

toys or take her out to eat after these sexual activities. Because they occurred late at night, McDonald's was the only restaurant that would be open.

{¶9} One time, while Truesdell was driving the victim to McDonald's in his Jeep, she was "jacking him off" while he was driving. He told her to stop because he felt like he was about to ejaculate. She asked him why he couldn't "pee," her term for ejaculation, on the floor. The victim could not remember if he actually ejaculated, but he said to her, "Oh, yeah, you're so smart."

{¶10} The victim stated that she had on occasion asked Truesdell to "massage" her. She said there was one instance when they were in the bathroom, she asked why it was that she was always touching him, and whether he could touch her "if massages feel so good." He then "massaged" her vaginal area. When asked how many times Truesdell touched her, she could not provide an exact number because of the "sheer amount of times that it happened."

{¶11} Truesdell told the victim to keep their activities secret. But she started to feel bad about keeping a secret from her mother. One day, she asked her mother if Truesdell ever gave her massages. Her mother said that it was a "really weird question," and "I guess sometimes on my back." When her mother told her to "stay away from . . . his penis," she realized that "this is a bad thing and I have to stop doing it."

{¶12} The victim said that it was not until she was in fifth grade, around 2011, that she realized that what Truesdell had been doing to her was wrong and "way worse" than she thought it was. After that Truesdell tried to initiate the sexual activity, but the victim told him that she wanted to stop. He "really kept trying to push," telling her that "if you close your eyes and I'll put something in your hand, and all you have to do is just shake it and then we can go get a toy." She refused, and the "massages" ended around that time.

{¶13} The victim decided to report Truesdell's abuse when she learned that G.M. was pregnant because she did not want him to abuse his grandchild. The victim went to see her cousin, S.D., who was also Truesdell's niece. S.D. was 12 years older than the victim, and the victim talked to her about the sexual abuse. S.D. told the victim's mother that the victim had made allegations of abuse against Truesdell. She testified that she was able to get the victim to go to therapy, and that the victim wanted to go to police and report the abuse.

{¶14} When the victim went to the Loveland police, Officer Mike Boettger arranged for her to be interviewed at the Mayerson Center for Safe and Healthy Children, because even though she was an adult at that time, he viewed her as a "fragile victim." Following that interview, Officer Boettger arranged for the victim to make several recorded "controlled calls," to get Truesdell to admit to what he had done. Because the first call was not successful, he had her call again. She made four phone calls, after which she burst into tears. She said that making those calls was "really hard," and "made her feel awful."

{¶15} For the most part, Truesdell said he didn't remember the incidents she described. On one of the calls, the victim asked him, "[W]hat about all the times in the bathroom when . . . I was touching you? . . . You didn't like that?" He replied, "See, I don't remember that. Uh-uh. Not – not many times. Not at all." At another time in the call, Truesdell told her, "[Y]ou can't cry over spilled milk. What happens happened. Or it didn't happen." Officer Boettger noted that during the calls, Truesdell complemented the victim, calling her beautiful. He also noted that Truesdell "did not seem overly stressed or upset over these allegations."

{¶16} Officer Boettger also identified a recording of a phone call from the jail between Truesdell and his daughter, which was played for the jury. They speculated that he was being "set up" because the victim's mother wanted the grandmother's

house. They referred to information they could not talk about during the phone call because they were both aware that the call was being recorded.

{¶17} Emily Harman, a social worker and forensic interviewer at the Mayerson Center, testified that she interviewed the victim in February 2020 after a referral from the Loveland police. She stated that children who have experienced childhood sexual abuse often have incomplete and delayed disclosures. The child may be too young to understand that she is being abused, and that she is supposed to tell someone about it. Sometimes the child may not have a safe adult to report it to.

{¶18} When asked what is the primary purpose when she interviews a child, she said that she is a "neutral interviewer," and she does not have an agenda "other than to help the person feel safe" with her so that the person being interviewed can share whatever she came to the interview about. She further explained the purpose of a forensic interview is to help the interviewed person to understand what she has been through, to help ensure that the person's body is healthy, and to help come up with a plan to help the person move forward mentally and physically. When asked whether the Mayerson Center "is predominantly for treatment for medical diagnos[is] and/or mental health diagnoses," she replied, "Yes . . . we evaluate, diagnosis [sic], and treat child abuse and neglect."

{¶19} During the interview, which was played for the jury, the victim discussed the episodes of sexual abuse, as well as Truesdell's statements about those episodes. Harmon said that the victim "engaged with" her, and that she was "easy to talk to." She said that her demeanor was "not inconsistent" with the demeanor of someone who had experienced a traumatic event. She explained that people respond differently to traumatic experiences, and that people can have "a wide gamut of expressions" when they are being interviewed.

{¶20} At the end of the interview, Harman asked whether the victim would like to see a doctor, and the victim said that she would. After the interview, Harman consulted with a child-abuse physician and shared the history that the victim had provided. Then the team met with the family to discuss medical-care options.

{¶21} G.M. testified on Truesdell's behalf. She said that she was about 13 years old when she moved in with the victim's family. She was nine years older than the victim, and she lived in the house until 2010. She stated that her father only stayed at the house for about two weeks.

{¶22} According to G.M., the house was filthy, and the victim's parents were heavy drinkers, which interfered with their ability to parent their three children. It fell to her to take care of them on the weekends, including getting them up, feeding them, and taking them outside. G.M. also had other concerns about how the parents were raising their children. She said she witnessed verbal abuse by the parents. They talked about inappropriate sexual topics in front of her and the other children, and the children did not wear clothes until they were about ten years old.

{¶23} G.M. also testified that there was no pool at the victim's house while she lived there. Her dad gave a pool to the family, possibly in 2013, about two years after she had left the house. She stated that her father did not have a computer until 2009 or 2010, well after the first incident described by the victim. She also said that she did not know whether Truesdell had gone to a casino in Indiana, but he had gone to one in Ohio around 2015. But she did not know whether he had gone to a casino in Indiana when she was 13 and living with the victim's family.

{¶24} G.M. slept in the living room until approximately 2010, and she stayed up late with her cousins. She did not remember Truesdell ever stopping by the house late at night while she lived there. She never saw him behave inappropriately toward the victim or take her into the bathroom.

{¶25} Truesdell's brother Joseph Truesdell also testified on his behalf. He said that he had never seen his brother drink at all. He admitted that he had moved from Cincinnati 30 years earlier, and he only saw his brother about once a year.

## II. Evidence About Pornography

{¶26} In his first assignment of error, Truesdell contends that the trial court abused its discretion by allowing the State to present evidence that he showed pornography on his cell phone to the victim. He argues that the evidence was not relevant and any probative value it might have had was outweighed by the danger of unfair prejudice. This assignment of error is not well taken.

{¶27} Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Under Evid.R. 403(A), relevant evidence is not admissible if its "probative value is substantially outweighed by the danger of unfair prejudice." *State v. Williams*, 2020-Ohio-1228, ¶ 38 (1st Dist.). The decision whether to admit or exclude evidence lies within the trial court's discretion. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus; *Williams* at ¶ 38.

{¶28} The prosecutor asked the victim if Truesdell had ever shown her pornography. She replied, "All the time." Truesdell objected and asked to approach the bench. After an off-the-record sidebar occurred, the prosecutor asked the question again, and the victim said that Truesdell had shown her pornography, mainly on his phone. When asked what type of things he would show her on his phone, she replied, "Naked women, topless women. The gifs of like girls with big boobs like jiggling around, jumping around, and stuff like that."

**{¶29}** Although Truesdell objected to this testimony, the record does not disclose the basis of the objection. Therefore, he has forfeited all but plain error on appeal. *See State v. Rogers*, 2015-Ohio-2459, ¶ 21-22; *State v. Steelman*, 2018-Ohio-1732, ¶ 15 (1st Dist.). An alleged error does not rise to the level of plain error unless, but for the error, the outcome of the trial would have been otherwise. *State v. Wickline*, 50 Ohio St.3d 114, 119-120 (1990); *State v. Whittle*, 2024-Ohio-1023, ¶ 35 (1st Dist.).

**{¶30}** Truesdell argues that the testimony about those images bore no relevance to the crimes with which he was charged. But the testimony that he showed nude images to the victim indicates that he was grooming the victim for sexual activity. "Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." *State v. Williams*, 2012-Ohio-5695, ¶ 21, quoting *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011).

**{¶31}** Truesdell's acts of showing sexual images to the victim was relevant to show how he normalized sexual behavior to his child victim. *See State v. Chute*, 2022-Ohio-2722, ¶ 23 (3d Dist.); *State v. C.D.S.*, 2021-Ohio-4492, ¶ 39 (10th Dist.). "It is well-established law in Ohio that testimony as to appellant's grooming of the victim is relevant information . . . ." *C.D.S.* at ¶ 39.

**{¶32}** Further, we cannot hold that the admission of that evidence was improper under Evid.R. 403(A). While the admission of the evidence was undoubtedly prejudicial, the rule only requires exclusion for "unfair prejudice." *State v. Walker*, 2020-Ohio-1581, ¶ 51 (1st Dist.). The reference to pornography was brief, and the evidence was not presented for the sole purpose of appealing to the jurors' emotions, sympathies or biases. *See id.*; *State v. Bell*, 2015-Ohio-1711, ¶ 48. Therefore,

9

we cannot hold that the trial court committed plain error in admitting the evidence, and we overrule Truesdell's first assignment of error.

### III. Prosecutorial Misconduct

**{¶33}** In his second assignment of error, Truesdell contends that the trial court erred by permitting the prosecutor to make improper remarks to the jury and to introduce improper evidence, thus denying his right to a fair trial. He argues that the prosecutor's remarks unfairly shifted the burden of proof to the defense. This assignment of error is not well taken.

**{¶34}** The test for prosecutorial misconduct is (1) whether the remarks or questions were improper, and (2) if so, whether the remarks affected the accused's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165 (1990); *Walker* at ¶ 37; *State v. Glenn*, 2011-Ohio-829, ¶ 52 (1st Dist.). The conduct of the prosecuting attorney cannot be grounds for error unless it deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405 (1993); *Walker* at ¶ 37.

**{¶35}** First, Truesdell argues that the prosecutor improperly shifted the burden of proof to the defense. The prosecutor asked Officer Boettger, "Are you aware, to your knowledge as a police detective in Loveland, was any report made by Charles Truesdell, to the Loveland police that somebody was making false allegations against him?" Truesdell objected on the basis that it was not relevant. The trial court overruled the objection, and Officer Boettger said that he was not aware of any report.

**{¶36}** Truesdell only objected on the basis of relevance, not that it shifted the burden of proof to him. Therefore, we review for plain error. *See State v. Maxwell*, 2014-Ohio-1019, ¶ 103; *State v. Fritsch*, 2023-Ohio-2676, ¶ 13 (1st Dist.).

**{¶37}** During defense counsel's cross-examination of Officer Boettger, defense counsel had asked questions about the victim's delayed reporting of the sexual abuse

and the fact that Truesdell did not make a direct admission of the abuse during the controlled calls. The prosecutor's question was in response to those questions. She referred to the fact that even though Truesdell knew that the victim's allegations "were going around the family," he never went to the police to deny the accusations. We cannot hold that the prosecutor's question denied Truesdell a fair trial, much less that any error on the part of the trial court in allowing the question rose to the level of plain error.

{¶38} Next, Truesdell takes issue with the prosecutor's statement in rebuttal closing argument, when she said, "Oh the State can't prove there was a pool? Neither could the defense witness. Oh, the State couldn't prove what casino? Neither could the defense witness." Prosecutors are normally entitled to wide latitude in their remarks. *State v. Mason*, 82 Ohio St.3d 144, 162 (1998); *Walker*, 2020-Ohio-1581, at ¶ 37 (1st Dist.). Throughout the trial and in closing argument, defense counsel emphasized some inconsistencies regarding when pool had been in the backyard and which casino Truesdell had gone to, whether in Ohio or Indiana. The prosecutor's statements were made in response to those arguments. They were fair comments on the evidence and did not improperly shift the burden of proof to him.

{¶39} Moreover, the trial court instructed the jury that the burden of proof rested entirely on the State and that Truesdell must be acquitted if the State did not prove all of the elements of the offenses beyond a reasonable doubt. That instruction mitigated the impact of the prosecutor's statement. *See State v. Kirkland*, 2020-Ohio-4079, ¶ 117. We presume that the jury followed the court's instructions. *State v. Whitaker*, 2022-Ohio-2840, ¶ 161; *State v. Johnson*, 2018-Ohio-4131, ¶ 35 (1st Dist.).

{¶40} Truesdell also argues that the prosecutor improperly denigrated defense counsel during closing arguments. It is improper for the prosecutor to denigrate

defense counsel in the jury's presence. *State v. Diar*, 2008-Ohio-6266 ¶ 219. Again, Truesdell failed to object to these comments so we review for plain error.

**{¶41}** Truesdell takes issue with the following statements by the prosecutor: "Man, the way you hear [defense counsel] talk, I'd have to prove this pool actually existed or that he went to a specific casino. That's defense smoke and mirrors. . . . That's why I want you to pay attention to the evidence. Don't pay attention to anything else that's a red herring. . . . Because the defense wants you to believe [G.M.'s] own messed up timeline . . . ."

**{¶42}** These comments were in response to defense counsel's argument that the State could not establish when the pool was there or to which casino Truesdell had gone. The prosecutor was arguing to the jury that the State had met its burden to prove the elements of the crime through the victim's testimony. The prosecutor also attempted to lessen the defense attack on the victim's testimony by asserting that her inability to recall certain details did not negate her credibility. The prosecutor's argument was based on the evidence, and she was not denigrating defense counsel. Because the prosecutor's comment was a direct response to defense counsel's argument, it was not improper. *See Walker*, 2020-Ohio-1581, at ¶ 41 (1st Dist.).

**{¶43}** The Ohio Supreme Court rejected a similar argument in *State v. Ford*, 2019-Ohio-4539. In that case, the prosecutor stated in his rebuttal argument that defense counsel "has done what I consider to be . . . the Jedi mind trick. It is, you know: Look over here, don't look at the evidence." The Court said, "The prosecutor's comment about 'the Jedi mind trick' was a creative response to defense counsel's argument and was not aimed at denigrating him." *Id.* at ¶ 366.

**{¶44}** Next, Truesdell argues that the prosecutor improperly referenced facts not in evidence or misrepresented evidence in the record during closing arguments. A prosecutor is entitled to latitude as to what the evidence has shown and what

12

inferences can be reasonably drawn from the evidence. *State v. Frazier*, 2007-Ohio-5048, ¶ 135. But a prosecutor has a duty not to mislead the jury and argue facts outside the evidence. *Lott*, 51 Ohio St.3d at 161; *State v. Robinson*, 2015-Ohio-773, ¶ 29 (1st Dist.).

**{¶45}** Truesdell contends that the prosecutor misstated the evidence when she said, "And you're going to hear, when you review that evidence, that Charles Truesdell agreed that he did it too." Even if the statement is misleading, the court mitigated the prosecutor's statement by instructing the jury that closing arguments are not evidence, and that it was for the jury to decide what the evidence showed. *See State v. Kirkland*, 2020-Ohio-4079, ¶ 117.

**{¶46}** Further, that comment was isolated in an otherwise proper argument. "Isolated comments by the prosecutor are not to be taken out of context and given their most damaging meaning." *Williams*, 2017-Ohio-8898, at ¶ 24 (1st Dist.), quoting *State v. Hill*, 75 Ohio St.3d 195, 204 (1996). It was not so egregious as to affect his substantial rights or to deny him a fair trial, much less rise to the level of plain error. *See Williams*, 2020-Ohio-1228, at ¶ 44 (1st Dist.).

**{¶47}** Finally, Truesdell argues that the prosecutor repeatedly asked almost all of the State's witnesses leading questions, and that the persistent leading questions permeated the trial. "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Evid.R. 611(C). Truesdell acknowledges that he did not object to the majority of the questions about which he complains.

**{¶48}** In making this argument, Truesdell lists 12 pages of the transcript where he alleges that the prosecutor asked leading questions, but he does not specify which of the questions were improper. The appellant bears the burden to show error by reference to the record. To be considered on appeal, errors by a trial court must be

argued and supported by legal authority and citation to the record. App.R. 16(A). "If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out." *Whittle*, 2024-Ohio-1023, at ¶ 52 (1st Dist.), quoting *State v. Brown*, 2013-Ohio-2720, ¶ 24 (1st Dist.).

**{¶49}** Further, a trial court has discretion to permit leading questions on direct examination. *State v. Nicholson*, 2024-Ohio-604, ¶ 275. A brief review of the pages that Truesdell cites, does not show that leading questions pervaded the trial in the face of a sustained objection. *See id.* The record does not show any error so prejudicial that it rises to the level of plain error.

**{¶50}** In sum, nothing in record the shows prosecutorial misconduct that deprived Truesdell of a fair trial, much less that there was plain error. Consequently, we overrule his second assignment of error.

### IV.  Mayerson Interview/Hearsay

**{¶51}** In this third assignment of error, Truesdell contends that the trial court erred in allowing Harman, the Mayerson Center interviewer, to testify regarding inadmissible hearsay statements elicited during her forensic interview with the victim. He argues that those statements do not fall within the hearsay exception for statements made for the purpose of diagnosis or treatment. This assignment of error is not well taken.

**{¶52}** Evid.R. 803(4) sets forth a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The victim's statement fell within this exception.

**{¶53}** Truesdell relies heavily on *State v. Arnold*, 2010-Ohio-2742, which primarily discusses whether statements for medical diagnosis and treatment are testimonial, and thus, violate the defendant's right to confront the witness against him. But this case does not implicate the Confrontation Clause because the victim testified at trial. *See Williams*, 2017-Ohio-8898, at ¶ 13 (1st Dist.); *State v. Lukacs*, 2010-Ohio-2364, ¶ 15 (1st Dist.).

**{¶54}** This court has stated that the trial court's determination of whether the statements were for the purpose of diagnosis and treatment depends on the facts of the case. *Lukacs* at ¶ 7. Relevant factors include (1) the nature of the questioning—whether the interviewer asked leading or suggestive questions; (2) whether the child had a reason to lie; (3) whether the child understood the need to tell the truth; (4) the age of the child at the time the statements were made; and (5) whether the child's statements were consistent. *Williams* at ¶ 11, citing *Lukacs* at ¶ 7.

**{¶55}** Specifically, Truesdell contends that Harmon should not have been able to testify about the victim's statements that (1) Truesdell asked her to massage his penis, (2) he showed her pornography on his phone, and (3) Truesdell had sexual contact with the victim in the pool and in the Jeep. First, he contends that none of these statements describe past medical history, explain the origin of any pain, sensations or symptoms the victim claimed to be experiencing at the time of the incidents, and they were of no value for diagnosis and treatment. We disagree. "Medical Diagnosis includes mental health, not just physical symptoms, pain, or sensations so that statements made to mental health providers can be included within the confines of Evid.R. 803(4)." *State v. Turner*, 2020-Ohio-1548, ¶ 38 (12th Dist.), citing *In re S.A.*, 2017-Ohio-8792, ¶ 41 (12th Dist.).

**{¶56}** Here, the victim was 19 years old at the time of her interview with Harmon. She was not questioned in a leading or suggestive manner, she understood

15

the need for telling the truth, and she was consistent in her allegations that Truesdell had engaged in sexual acts with her. At the end of the interview, Harmon asked the victim if she would like to see a doctor, and the victim said that she would. After the interview, Harmon consulted with a child-abuse physician and shared the history that the victim provided. Then, the team met with the family to discuss medical-care options.

**{¶57}** Consequently, the statements fell within the hearsay exception for statements for medical diagnosis and treatment under the hearsay exception set forth in Evid.R. 803(4). This court has "consistently upheld the trial court's decision to admit statements made during these forensic interviews as statements made for purposes of a medical diagnosis or treatment under Evid.R. 803(4)." *State v. Hammonds*, 2024-Ohio-1259, ¶ 72 (1st Dist.). We overrule Truesdell's third assignment of error.

### V. Weight and Sufficiency

**{¶58}** Truesdell argues his fourth and fifth assignments of error together. In his fourth assignment of error, Truesdell contends that his convictions were not supported by sufficient evidence. In his fifth assignment of error, Truesdell argues that his convictions were against the manifest weight of the evidence.

**{¶59}** Truesdell argues that no physical evidence linked him to the offenses. But no rule of law exists that a witness's testimony must be corroborated by physical evidence. *State v. Durgan*, 2018-Ohio-2310, ¶ 39 (1st Dist.). He also argues that the State did not present any eyewitnesses to corroborate the victim's testimony. But a conviction "may rest solely on the testimony of a single witness, including the victim, if believed, and there is no requirement that a victim's testimony be corroborated to be believed." *State v. Wright*, 2024-Ohio-851, ¶ 32 (1st Dist.), quoting *State v.*

16

*Mitchell*, 2022-Ohio-3713, ¶ 17 (1st Dist.). More specifically, there is "no requirement, statutory or otherwise, that a rape victim's testimony be corroborated" by physical evidence. *Wright* at ¶ 32, quoting *State v. Love*, 49 Ohio App.3d 88, 91 (1st Dist. 1988).

{¶60} Truesdell also argues that the State failed to connect individual, distinguishable events to separate and distinct physical charges. We disagree. The victim presented a detailed, coherent narrative of Truesdell's crimes. Any inconsistencies in her testimony did not relate to the elements of the offenses, but to circumstances surrounding those offenses.

{¶61} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the State proved beyond a reasonable doubt all of the elements of the six counts of gross sexual imposition. Therefore, the evidence was sufficient to support the convictions. *See State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Hackney*, 2016-Ohio-4609, ¶ 29 (1st Dist.).

{¶62} Further, after reviewing the record, we cannot say that the trier of fact created such a manifest miscarriage of justice that we must reverse his convictions and order a new trial. Therefore, the convictions are not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Jilson*, 2012-Ohio-1034, ¶ 6 (1st Dist.). Truesdell's fourth and fifth assignments of error are not well taken, and they are overruled.

### VI. Indictment

{¶63} In his sixth assignment of error, Truesdell contends that his "due-process rights were violated due to the overbroad and unspecific time frame for the alleged offenses set forth in the indictment." He argues that the lack of specificity in

the indictment presented him from preparing an effective defense. This assignment of error is not well taken.

**{¶64}** Under the United States and Ohio Constitutions, an individual accused of a felony is entitled to an indictment setting forth the "nature and cause of the accusation." *State v. Sellards*, 17 Ohio St.3d 169, 170 (1985); *Lukacs*, 2010-Ohio-2364, at ¶ 41 (1st Dist.). The government must aver all material facts constituting the essential elements of the offense so that the accused not only has adequate notice and an opportunity to defend, but also may protect himself from any future prosecution for the same offending conduct. *Sellards* at 170; *Lukacs* at ¶ 41. But the indictment need not contain a recitation of the evidence supporting the various facts. *Sellards* at 170-171; *Lucaks* at ¶ 41.

**{¶65}** Precise dates and times are not essential elements of offenses, and the failure to provide them is not fatal to the indictment. *Sellards* at 171; *Lukacs* at ¶ 42. "In many cases involving the sexual abuse of children, the victims are simply unable to remember exact dates, especially where the crimes involve a repeated course of conduct over an extended period of time." *State v. Svoboda*, 2021-Ohio-4197, ¶ 125 (1st Dist.), quoting *State v. See*, 2020-Ohio-2923, ¶ 17 (1st Dist.). "[L]arge time windows in the context of child abuse prosecutions are not in conflict with constitutional notice requirements." *Lucaks* at ¶ 42, quoting *State v. Morgan,* 2010-Ohio-1720, ¶ 12 (12th Dist.).

**{¶66}** The accused can obtain more specific details by requesting a bill of particulars as provided in Crim.R. 7(E). But the bill of particulars need not provide the accused with specifications of the evidence or serve as a substitute for discovery. *Sellards* at 171; *Lucaks* at ¶ 43. The State must supply specific dates and times in response to a request for a bill of particulars when it possesses that information. The failure to provide exact dates is fatal to the case only if the absence of specifics

prejudices the accused's ability to prepare and present a defense. *Sellards* at syllabus; *Lukacs* at ¶ 43.

{¶67} Counts five to ten of the indictment were the counts alleging gross sexual imposition. Counts five, six and seven stated that the offenses occurred between May 1, 2007, and December 31, 2007. Counts eight, nine and ten stated that the offenses occurred between January 1, 2008, and January 10, 2011. Additionally, the state provided Truesdell a bill of particulars that described specific sexual acts that occurred over a period of time and where those acts had occurred.

{¶68} The lack of specificity of the dates did not prejudice Truesdell's ability to defend himself because he did not raise a date-specific defense. He argues that "[w]ith no specifics, any alibi defense was unfairly taken away from him. . . ." But nothing in the record shows that Truesdell planned to present an alibi defense. His defense at trial was that the victim had fabricated the allegations of sexual abuse. Thus, Truesdell has failed to show that the dates in the indictment were so broad that he was unable to effectually defend himself against the allegations. Consequently, we overrule his sixth assignment of error.

### *VII. Jury Instruction*

{¶69} In his seventh assignment of error, Truesdell contends that the trial court committed plain error by instructing the jury that they only needed to find that the offenses took place on a date reasonably near the date claimed in the indictment. This assignment of error is not well taken.

{¶70} Truesdell acknowledges that he failed to object to the instruction, and we review for plain error. "Ordinarily, precise times and dates are not essential elements of offenses." *State v. Solorio*, 2022-Ohio-3749, ¶ 17, quoting *Sellards*, 17 Ohio St.3d at 171. The instruction about which Truesdell complains is almost identical

to *Ohio Jury Instructions*, CR § 413.07(1)(A) (Rev. May 21, 2022). In light of the instruction's tracking the pattern jury instructions, nothing in the instruction deprived the defendant of due process or rose to the level of plain error. *See Solorio* at ¶ 20; *State v. Tunstall*, 2020-Ohio-5124, ¶ 57 (12th Dist.). We overrule Truesdell's seventh assignment of error.

### *VIII. Sentencing*

**{¶71}** In his eighth assignment of error, Truesdell contends that the record does not support the trial court's imposition of consecutive maximum sentences, which is tantamount to a life sentence. He argues that the record does not support the imposition of six consecutive sentences. This assignment of error is not well taken.

**{¶72}** Before a reviewing court can modify or vacate a felony sentence, it must clearly and convincingly find that the sentence is contrary to law or that the record does not support the trial court's findings. *State v. Marcum*, 2016-Ohio-1002, ¶ 1; *State v. White*, 2013-Ohio-4225, ¶ 11 (1st Dist.). When imposing consecutive sentences, a trial court must make the required findings as part of the sentencing hearing and incorporate those findings in the sentencing entry. *State v. Bonnell*, 2014-Ohio-3177, syllabus; *Walker*, 2020-Ohio-1581, at ¶ 68 (1st Dist.). The court need not use "talismanic words" but the record must show that the court engaged in the requisite analysis and that the evidence supports the findings. *Walker* at ¶ 68.

**{¶73}** Truesdell acknowledges that the trial court made the findings necessary for the imposition of consecutive sentences. He argues that those findings were not supported by the record. He further argues that this court may modify imposition of consecutive sentences that are not supported by the record, relying on this court's decision in *State v. Glover*, 2023-Ohio-1153 (1st Dist.) (*Glover I*). The Ohio Supreme

Court reversed *Glover I* in *State v. Glover*, Slip Opinion No. 2024-Ohio-5195 (plurality) (*Glover II*).

{¶74} In *Glover I*, we discussed *State v. Gwynne*, 2022-Ohio-4607 ("*Gwynne IV*"), in which the Ohio Supreme Court held that an appellate court should review the imposition of consecutive sentences de novo, and that the findings justifying the imposition of consecutive sentences "must be made in consideration of the aggregate term to be imposed." *Id.* at ¶ 1; *Glover I* at ¶ 70. We noted that the dissent in *Gwynne IV* stated that ordinarily, "appellate courts defer to the trial court's broad discretion in making sentencing decisions." *Glover I* at ¶ 71, quoting *Gwynne IV* at ¶ 52. While the dissent disagreed that a court must make findings in considering the aggregate term, both the majority and the dissenting opinions "appeared to agree that a court *can* consider the aggregate sentence when determining whether to impose consecutive sentences and, if so, how many of the prison terms should be served consecutively." *Id.* at ¶ 73.

{¶75} In *Glover I*, the defendant was convicted of six counts of robbery and five counts of kidnapping, with accompanying firearm specifications. The trial court imposed an aggregate sentence of 60 years' imprisonment. We held that "the trial court's findings involving proportionality under R.C. 2929.14(C)(4) and criminal history under R.C. 2929.14(C)(4)(c) were clearly and convincingly not supported by the record." *Id.* at ¶ 85. Ultimately, we ordered the trial court to impose an aggregate sentence of 25 years of incarceration.

{¶76} After *Gwynne IV*, the State filed a motion for reconsideration, which the Supreme Court granted. In *State v. Gwynne*, 2023-Ohio-3851 (plurality) ("*Gwynne V*"), the Court rejected its holding in *Gwynne IV*. The lead opinion stated that R.C. 2953.08(G)(2) specifically provides that an appellate court may increase, reduce, or otherwise modify consecutive sentences only if the record does not "clearly and

convincingly" support the trial court's consecutive-sentences findings. *Id.* at ¶ 13. If the evidence supports the trial court's consecutive findings, "the analysis ends there." *Id.* at ¶ 24.

{¶77} Subsequent to *Gwynne V*, the Ohio Supreme Court decided *Glover II*. In the lead opinion, the court stated that "[o]rdinarily appellate courts defer to the broad discretion the trial courts have in making sentencing decisions." *Id.* at ¶ 39, quoting *State v. Ladson*, 2016-Ohio-7881, ¶ 9 (8th Dist.). "Except to the extent specifically directed by statute, 'it is not the role of the appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.'" *Id.*, quoting *Williams v. United States*, 503 U.S. 193, 205 (1992). Under the plain language of R.C. 2953.08(G), the court must review the trial court's consecutive-sentences findings, and it may "increase, reduce, or otherwise modify" consecutive sentences only if it clearly and convincingly finds that the record does not support the trial court's findings or it clearly and convincingly finds that the sentences are otherwise contrary to law. *Id.* at ¶ 42.

{¶78} In this case, the record supports the trial court's findings. At the sentencing hearing, the victim described the devastating effect that the sexual abuse had on her life, to the point that she considered killing herself to escape the guilt and trauma she had endured. S.D., her cousin, described how upset and distraught the victim had been, and the sacrifices she willingly made to "basically raise" the victim. They both asked for consecutive sentences so that Truesdell could not hurt another child. The State argued that Truesdell had shown no remorse and forced the victim to relive the trauma. The court considered those statements along with the evidence at trial. It stated, "I don't have the words for the violation that took place here. Children, my God, the innocence that they have and the trust they put in their family members, it is just so unbelievably pure and lovely. And to have that ripped away is really an

ultimate betrayal." Thus, the record does not support Truesdell's claim that the 360-month aggregate prison was "excessive" and "disproportionate to other similar cases."

**{¶79}** Truesdell also argues that the court erred in imposing the maximum sentence on each count. But an appellate court may not independently weigh the evidence in the record and substitute its judgement for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12. *State v. Jones*, 2020-Ohio-6729, ¶ 42. Consequently, we overrule his eighth assignment of error.

**{¶80}** In sum, we find no merit in Truesdell's arguments. Consequently, we overrule his eight assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**BOCK, P.J.,** and **CROUSE, J.,** concur.

Please note:
   The court has recorded its own entry this date.