[Cite as *State v. Turner*, 2025-Ohio-386.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240250 |
| | | TRIAL NO. B-2203684B |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | |
| | | *O P I N I O N* |
| FRANK TURNER, | : | |
| | | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: February 7, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

CROUSE, Judge.

{¶1} Defendant-appellant Frank Turner appeals his convictions, following a jury trial, for murder and having a weapon while under disability. In four assignments of error, he argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, that he received ineffective assistance from his trial counsel, and that the record does not support the imposition of consecutive sentences.

{¶2} For the reasons set forth in this opinion, we find Turner's arguments to be without merit and affirm the judgment of the trial court.

## I.    *Factual and Procedural History*

{¶3} On August 10, 2022, Turner was charged in a six-count indictment with two counts of murder in violation of R.C. 2903.02(A) and (B), two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), and two counts of having a weapon while under disability in violation of R.C. 2923.13(A)(2) and (A)(3). The charges for murder and felonious assault carried accompanying weapon specifications.

{¶4} The charges in this case concerned Turner's role in the death of A.Z. On July 31, 2022, A.Z., who was on foot, was pursued by a vehicle driven by Ronnicea McCary. McCary had two passengers in her vehicle. The front-seat passenger was Cordall Thompson, and the State alleged that Turner was the second passenger. Thompson ultimately exited McCary's vehicle, pursued A.Z. on foot, and shot and killed him. Turner was charged under a theory of complicity.

{¶5} Turner was tried before a jury on all counts in the indictment except for the weapon-under-disability charge in Count 6. The evidence presented at trial established that after A.Z. was pursued and shot by the persons in McCary's vehicle,

he collapsed in front of a home on Lockhurst Lane. Paramedics were called to the home and A.Z. was transported to the hospital, where he died. His official cause of death was exsanguination caused by multiple gunshot wounds to his extremities.

**{¶6}** Trial testimony from Cincinnati Police Detectives Carl Beebe and Aubrey Pitts, both of whom investigated A.Z.'s death, established that during the investigation, the police accessed footage from Cincinnati's Real Time Crime Center cameras and from surveillance cameras operated by the Sands Senior Apartments. These cameras captured the pursuit of A.Z. by a white Lincoln Navigator and then by one of the passengers from that vehicle who chased A.Z. on foot. The Navigator had two distinguishing characteristics: a fuel door that was a different color than the rest of the vehicle and a missing hub cap on the left rear wheel. This video footage from the surveillance cameras, along with an officer's body-worn-camera footage, was compiled into an exhibit for trial chronicling the pursuit.

**{¶7}** Detective Pitts testified in detail about the events depicted in the video exhibit while the video was simultaneously played for the jury. He explained that the first scene of the video depicted A.Z. parking his car on a downtown street at approximately 2:35 a.m. on July 31, 2022, exiting from the vehicle, and walking away.[1] At approximately 2:46 a.m., the cameras captured A.Z. as he walked down a nearby alley, across a street, and into the parking lot of the Sands Senior Apartments. Several seconds later, the white Lincoln Navigator, driven by McCary, drove the wrong way down the one-way street that A.Z. had crossed. The vehicle slowed down, and several bursts of gunfire were expelled from it.

---

[1] Trial testimony from Detective Beebe and Jennifer Strack, the property manager for Sands Senior Apartments, established that the time stamp on the video footage obtained from the cameras operated by Sands Senior Apartments was seven minutes fast. Any time referenced in this opinion accounts for this difference and is in real time.

**{¶8}** Detective Pitts's narration of the video exhibit established that Thompson exited from the front passenger seat of the vehicle and fired at A.Z. as he chased him through the parking lot of the Sands Senior Apartments. Shots were also fired at A.Z. by both McCary, who was driving, and the second passenger, who was seated in the back of the vehicle. The muzzle flashes from the shots were captured by the surveillance cameras and depicted on the video. After Thompson exited the car, the second passenger moved from the back of the vehicle to the front passenger seat. Detective Pitts explained that Thompson continued to chase and shoot at A.Z. while A.Z. ran towards the front of the Sands Senior Apartments, down a set of stairs, and across a street.

**{¶9}** McCary's vehicle followed the path of the foot chase along downtown streets, until it eventually stopped on Poplar Street and pulled to the side of the road. The second passenger, who was wearing black shorts and a white shirt, exited the vehicle with a rifle and walked in the same direction that Thompson had chased A.Z. Both the second passenger and Thompson returned to the vehicle less than a minute later. Detective Pitts testified that the video depicted the second passenger putting the rifle back in the car. He further explained that after both passengers returned to the vehicle, it would not start, prompting Thompson and the second passenger to open the hood.

**{¶10}** Detective Pitts testified that the video depicted flashing lights from approaching police vehicles as the two men worked on the car. Thompson eventually got into the front seat of the vehicle and McCary drove away. The second passenger walked down the street towards the approaching police lights at 2:48 a.m. Detective Pitts explained that the next portion of the video depicted footage obtained from the body-worn camera of Cincinnati Police Officer Thomas Sanders. The body-worn-

camera footage showed Officer Sanders stop the second passenger at 2:49 a.m. as he walked down the street.

{¶11} Testimony from Officer Sanders corroborated Detective Pitts's explanation of the video evidence. Officer Sanders testified that he was dispatched for a report of shots fired on July 31, 2022. According to Officer Sanders, he saw an individual walking towards him as he drove down Poplar Street. He stopped and asked this individual if he had heard any shots. Officer Sanders did not obtain any personal or identifying information from this individual, but the person was later identified by Cincinnati Police Officer Andy Sullivan as Turner.

{¶12} Officer Sullivan testified that he has patrolled the West End area where A.Z. was pursued and shot since 2017 and is familiar with the area and the people in the community. He explained that because of that familiarity, he was asked for help identifying an individual that was captured on Officer Sanders's body-worn-camera footage. Officer Sullivan identified Turner as the individual that Officer Sanders had stopped. He testified that he was familiar with Turner and had seen him at least a dozen times prior.

{¶13} Detective Beebe testified in detail about the investigation into A.Z.'s death, and explained how McCary was linked to the vehicle that pursued A.Z. He stated that after reviewing the video footage and querying records from the Ohio Bureau of Motor Vehicles, he was able to determine a license plate for the Lincoln Navigator captured by the surveillance cameras. The vehicle was registered to McCary. Detective Beebe tracked the vehicle to an area in the West End near the scene of the homicide and recovered it just before 2:00 p.m. on the day of the shooting. McCary was standing outside the vehicle when the police arrived to seize it. According to Detective Beebe, all four car doors were open and it appeared that McCary was cleaning the vehicle.

{¶14} Detective Beebe testified that the vehicle was towed to a processing garage and examined. Three weapons were recovered during the search of the vehicle: a rifle was found in a black bag on a back seat, a Smith and Wesson M&P 9 mm Shield pistol was found in a bag on the front passenger seat, and a Smith and Wesson M&P .40-caliber pistol was found in the glovebox.

{¶15} Criminalist Gianna Favro testified that she processed several crime scenes in this case, including the location where A.Z. collapsed and several areas near the Sands Senior Apartments. Collectively, she recovered 12 .40-caliber casings, eight 9 mm casings, one .380 casing, one .45 casing, and several pieces of jacketing and lead core. She also recovered a .45-caliber Hi-Point firearm near the area where A.Z.'s body was discovered. Favro stated that she assisted in the processing of the Lincoln Navigator, and she offered testimony that largely echoed that offered by Detective Beebe concerning the weapons that were recovered from the vehicle. She further testified that the exterior of the Navigator had several bullet holes. Favro additionally stated that she swabbed multiple items in the vehicle for DNA testing, including the recovered firearms.

{¶16} The swabs taken by Favro were processed by a forensic scientist in the serology department of the Hamilton County Coroner's Office. Testimony presented at trial established that both McCary's and Thompson's DNA was found on several items recovered from the vehicle, but no recovered DNA was linked to Turner. The DNA found on all the weapons recovered from the Navigator was insufficient to run a comparison or pull out a major profile.

{¶17} McCary's driver's license, as well as probation paperwork addressed to Thompson, were found in the vehicle. Thompson's fingerprints were found on the probation paperwork.

{¶18} Bridget Chambers, a forensic scientist in the firearms-identification section of the Hamilton County Coroner's Office, testified that she examined the firearms, bullets, and casings that were recovered in this case. Chambers testified that the .40-caliber Smith and Wesson M&P was determined to be operable and to have fired the recovered .40-caliber casings. The Smith and Wesson M&P 9 mm Shield pistol was also determined to be operable, and five of the recovered 9 mm casings were determined to have been fired from that weapon. The .45-caliber Hi-Point firearm was test fired and found to be operable and to have fired the recovered .45-caliber casing. Chambers further testified that the rifle was not examined because none of the recovered evidence could have been fired from that weapon.

{¶19} In addition to testifying about the video exhibit, Detective Pitts testified that during his investigation he listened to telephone calls that Turner placed while incarcerated. He referenced a particular call in which Turner admitted that he "gave the girl a jump." This call was played for the jury, and Detective Pitts identified Turner as the voice on the call. Turner can be heard on the call discussing the evidence against him and stating that he was caught on video "giving a girl a jump" and "that's it bruh, me giving her a jump."

{¶20} Detective Pitts's testimony did not link Turner to a particular firearm that was recovered from McCary's vehicle. While Detective Pitts testified that he believed Thompson operated the .40-caliber gun, he could not state which weapon Turner had used while firing at A.Z. from the backseat of the vehicle. Detective Pitts's testimony also addressed Turner's attire when these events unfolded. He stated that Turner had been wearing black shorts and a tight white t-shirt.

{¶21} The jury found Turner guilty of all offenses. The trial court imposed a sentence of 15 years' to life imprisonment for the offense of murder in Count 1, along

with a consecutive three years of imprisonment for the accompanying weapon specification. The remaining count of murder and both counts of felonious assault were merged with Count 1 at sentencing. A sentence of 36 months of imprisonment was imposed for the offense of having a weapon while under disability in Count 5. That sentence was ordered to be served consecutively to the sentence imposed for Count 1, resulting in an aggregate sentence of 21 years' to life imprisonment. A corresponding entry reflecting this sentence was issued on February 20, 2024.

**{¶22}** Turner appealed the trial court's judgment, but this court dismissed the appeal for lack of a final order because Count 6 of the indictment, which charged Turner with a second count of having a weapon while under disability, had not been resolved. The trial court subsequently issued an entry dismissing Count 6. The trial court also issued a nunc pro tunc sentencing entry on April 11, 2024. This entry set forth the same sentences that had been imposed at the sentencing hearing and that were in the original sentencing entry, and it reflected the dismissal of Count 6. However, it incorrectly stated that the aggregate sentence imposed was "twenty-one (21) year to life, six (6) years in the Department of Corrections." Turner has appealed from this nunc pro tunc sentencing entry.

**{¶23}** Before turning to the merits of Turner's appeal, we must address a problem with the trial court's nunc pro tunc entry. The purpose of a nunc pro tunc entry is to reflect "what a court 'actually decided, not what the court might or should have decided or what the court intended to decide.'" *State v. Ware*, 2014-Ohio-5201, ¶ 16, quoting *State ex rel. Fogle v. Steiner*, 74 Ohio St.3d 158, 164 (1995). In other words, the use of a nunc pro tunc entry is "limited to the subsequent recording of a judicial action previously and actually taken." (Cleaned up.) *Miller v. Watkins*, 2004-Ohio-3132, ¶ 6 (1st Dist.).

8

**{¶24}** Here, the trial court improperly used the nunc pro tunc entry to reflect the dismissal of Count 6, which was a substantive change in the judgment and not a mere reflection of what actually occurred. *See id.* at ¶ 8. As such, the nunc pro tunc entry was invalid. *Id.* at ¶ 8-9. Because the nunc pro tunc entry was invalid, the trial court's original sentencing entry remains in effect. *State v. Rowland*, 2002 Ohio App. LEXIS 1463, *5 (3d Dist. Mar. 29, 2002) (disregarding an invalid nunc pro tunc entry and holding that the entry originally issued therefore remained in effect); *accord Pollock v. Hall*, 2017-Ohio-1218, ¶ 10-11 (6th Dist.). And as the trial court has since issued an entry reflecting the dismissal of Count 6, no charges remain unresolved, and the original sentencing entry is a final and appealable order.

## II.    *Sufficiency and Weight of the Evidence*

**{¶25}** In his first and second assignments of error, Turner challenges the sufficiency and the weight of the evidence supporting his convictions. We address these assignments together.

**{¶26}** Turner challenges the evidence supporting all five offenses for which the jury returned guilty verdicts. But no sentences were imposed for the offenses of murder in Count 2 or felonious assault in Counts 3 and 4 because those offenses were merged at sentencing with the offense of murder in Count 1. In the absence of the imposition of a sentence, Turner was not convicted of these offenses. *See State v. Cooper*, 2019-Ohio-2813, ¶ 15 (1st Dist.). And in the absence of a judgment of conviction, "we do not consider a challenge to the sufficiency or the weight of the evidence" with respect to the merged offenses. *Id.*

**{¶27}** In reviewing a challenge to the sufficiency of the evidence, we must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

9

crime proven beyond a reasonable doubt." (Cleaned up.) *State v. Walker*, 2016-Ohio-8295, ¶ 12.

**{¶28}** In contrast, when reviewing a challenge to the manifest weight of the evidence, this court must "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 25.

**{¶29}** Turner was convicted of murder in violation of R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another." He was charged under a theory of complicity pursuant to R.C. 2923.03. This statute states that

No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

R.C. 2923.03(A)(1)-(4).

**{¶30}** Turner was additionally convicted of having a weapon while under disability in violation of R.C. 2923.13(A)(2), which provides in relevant part that "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if . . . [t]he person is under indictment for or has been convicted of any felony offense of violence." Turner stipulated that he was previously convicted of an offense that

prohibited him from acquiring, having, carrying, or using a firearm, and that he had not been relieved from that disability.

**{¶31}** In his challenges to the sufficiency and weight of the evidence, Turner argues that the evidence failed to identify him as the perpetrator of the offenses. He concedes that, other than the identity of the second passenger who was an accomplice to McCary and Thompson, the facts are not in dispute, and he does not challenge any other elements of the offenses. We accordingly must determine whether the evidence established that Turner was the second passenger in McCary's vehicle.

**{¶32}** The video exhibit and Detective Pitts's accompanying narration established that the second passenger fired shots at A.Z. while seated in the back seat of the vehicle. That passenger, who wore a white shirt and dark shorts, subsequently moved to the front passenger seat before exiting from the vehicle with a rifle and walking in the same direction that Thompson had chased A.Z.

**{¶33}** That passenger and Thompson returned to the vehicle, where they both lifted the hood and examined underneath. The problem with the vehicle was seemingly fixed, as it drove away shortly thereafter with Thompson inside. The second passenger walked down Poplar Street at 2:48 a.m. and was illuminated by spotlights from approaching police vehicles as he walked.

**{¶34}** The next section of the video exhibit depicted Officer Sanders stop a person waking down Poplar Street at 2:49 a.m. and ask him if he had heard any shots fired. The person stopped by Officer Sanders was wearing the same-colored clothing as the second passenger, and the timing of the video established that Officer Sanders pulled to the curb near this person at the same time the second passenger was walking down the street.

**{¶35}** We hold that this evidence was sufficient to establish that the second

passenger was the same person stopped by Officer Sanders. And that person was identified by Officer Sullivan as Turner. Further establishing Turner's identity as the second passenger was his jail telephone call, during which he discussed the evidence against him and stated that he was caught on video "giving a girl a jump."

**{¶36}** Turner further argues that there was no evidence that he was complicit in the commission of these offenses. The record, however, belies this assertion. Where an offender is charged with complicity, the evidence must establish more than the offender's "mere association with the principal offender." (Cleaned up.) *State v. Lawson*, 2024-Ohio-2466, ¶ 17 (1st Dist.). Rather, the evidence must show that the offender "actively participate[d] in the offense" by assisting or encouraging the principal offender. *Id.* Here, as summarized in the preceding paragraphs, the evidence established that Turner fired at A.Z. from the backseat of McCary's vehicle and then, while carrying a rifle, followed on foot the path that Thompson had chased A.Z. These actions constitute more than "mere association" and demonstrate "active[] participat[ion] in the offense." *Id.*

**{¶37}** We accordingly hold that Turner's convictions for murder and having a weapon while under disability were supported by sufficient evidence.

**{¶38}** In support of his contention that his convictions were against the manifest weight of the evidence, Turner relies on *State v. Short*, 2024-Ohio-92 (10th Dist.), a recent case out of the Tenth District. In *Short,* the defendant was found guilty of multiple offenses including, as relevant to this appeal, several counts of aggravated murder. *Id.* at ¶ 5. The Tenth District reversed one of Short's aggravated-murder convictions after determining that it was against the manifest weight of the evidence. *Id.* at ¶ 90.

**{¶39}** In reversing, the court explained that there were no eyewitnesses to this

offense and no physical evidence tying Short to the scene. *Id.* at ¶ 38-39, 63. The court acknowledged that "home surveillance footage in the neighborhood captured a person walk up to the U-Haul, pull out a handgun, shoot through the U-Haul's passenger window multiple times, and run away," and that a lay witness identified Short as the shooter in the video. *Id.* at ¶ 38 and 40. But it found that the surveillance video did "not show the shooter's face with any clarity" and was of "poor quality." (Cleaned up.) *Id.* at ¶ 46. The court accordingly determined that the video did not depict the identifying characteristics that the lay witness attributed to Short when identifying him in the video, including his gait and his clothing, and that the video "lacked discernible detail" to support a "credible identification." *Id.* at ¶ 54, 55, and 67.

{¶40} We find *Short* to be distinguishable. First, the quality of the video in the case at bar is not nearly as poor as that described in *Short*. While the video is in night vision and portions of the video depict the captured scene from a distance, the clothing of the second passenger is readily identifiable. Further, notably absent in *Short* is any statement from the defendant placing himself at the scene of the crime. Here, the record contains Turner's statement that he was caught on video "giving a girl a jump." Turner's own statement corroborated the video evidence, which showed the second passenger working underneath the hood of McCary's vehicle.

{¶41} Turner further contends that there was no physical evidence linking him to McCary's vehicle or to any of the recovered weapons. But such evidence is not necessary to sustain a conviction. *State v Carter*, 2023-Ohio-18, ¶ 17 (1st Dist.), quoting *State v. Peeples*, 2014-Ohio-4064, ¶ 21 (10th Dist.) ("'a lack of physical evidence, standing alone, does not render appellant's conviction against the manifest weight of the evidence'"). The jury was entitled to rely on the video evidence and Turner's own statement acknowledging that he had given a jump to McCary's vehicle.

This was not the rare case in which the jury lost its way and committed a manifest miscarriage of justice in convicting Turner. *See Powell*, 2020-Ohio-4283, at ¶ 16 (1st Dist.). We accordingly hold that Turner's convictions were not against the manifest weight of the evidence.

**{¶42}** The first and second assignments of error are overruled.

### III. *Ineffective Assistance*

**{¶43}** In his third assignment of error, Turner argues that he received ineffective assistance from his trial counsel because counsel failed to engage an expert to conduct an independent examination of the firearms and to enhance the video of the incident.

**{¶44}** Counsel will not be considered ineffective unless her or his performance was deficient and caused actual prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989). Counsel's performance will only be deemed deficient if it fell below an objective standard of reasonableness. *Strickland* at 687-688; *Bradley* at 142. A defendant is only prejudiced by counsel's performance if there is a reasonable probability that the outcome of the proceedings would have been different but for the deficient performance. *Strickland* at 694; *Bradley* at 142. A reviewing court must indulge a presumption that counsel's behavior fell within the acceptable range of reasonable professional assistance. *Strickland* at 689; *Bradley* at 142.

**{¶45}** We first address Turner's contention that trial counsel was ineffective for failing to engage an expert to conduct an independent examination of the recovered firearms. Turner acknowledges that the State's forensic scientist testified as to the lack of DNA or fingerprints from Turner on any of the processed items, but he argues that it would have given tremendous credibility to his case if his counsel had presented

14

independent testing to the jury highlighting the lack of physical evidence and impressing upon the jury that he did not fire a weapon.

**{¶46}** We find Turner's argument to be wholly without merit. First, contrary to Turner's assertion, the lack of physical evidence linking him to a firearm does not equate to a determination, or require the jury to conclude, that he never fired a weapon. Second, not only did the State present testimony on this exact topic, but the State's expert plainly testified that Turner was *not* a major contributor to the DNA recovered on any of the items submitted for testing, including the firearms. We fail to see how a second expert testifying to this same information would have assisted Turner's defense, and we hold that Turner has not established that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's failure to retain an independent expert to examine the firearms. *See Strickland* at 694; *Bradley* at 142.

**{¶47}** Turner next argues that trial counsel was ineffective for failing to engage an expert to enhance the quality of the surveillance video and to examine the time stamps on the video. He contends that the enhanced video would have established that he was wearing different clothing than the second passenger, and that his stature and height differed from that of the second passenger. But Turner's assertion as to what such an expert would have testified to is pure speculation. *See State v. Arnold*, 2020-Ohio-2706, ¶ 85 (1st Dist.). As we have explained, "On direct appeal, it is often impossible for us to review such claims [of ineffective assistance] without any proffer or other evidence in the record about how a hypothetical expert might have testified." *State v. Solorio*, 2022-Ohio-3749, ¶ 34 (1st Dist.). Given the absence of any proffer in the record as to what such an expert would have testified to, we hold that Turner has not demonstrated that there was a reasonable probability that the outcome of the

proceedings would have been different but for counsel's failure to hire an expert. *See Arnold* at ¶ 85.

**{¶48}** As we recently noted in *State v. Collins*, 2024-Ohio-5112, ¶ 73 (1st Dist.), claims of ineffective assistance that are dependent upon evidence outside of the trial record are better suited for petitions for postconviction relief pursuant to R.C. 2953.21, or similar proceedings where evidence outside the trial record can be introduced.

**{¶49}** We accordingly overrule Turner's third assignment of error.

### *IV.    Consecutive Sentences*

**{¶50}** In his fourth assignment of error, Turner argues that the trial court erred in the imposition of consecutive sentences.

**{¶51}** Pursuant to R.C. 2953.08(G)(2), we may only modify or vacate a felony sentence if we clearly and convincingly find that the record does not support the trial court's sentencing findings under certain specified divisions, including R.C. 2929.14(C)(4), or that the sentence is otherwise contrary to law. *See State v. Truesdell*, 2024-Ohio-5376, ¶ 72 (1st Dist.). Turner contends that the sentences imposed for the offenses of murder and having a weapon while under disability should have been run concurrently because the facts in the record did not support the imposition of consecutive sentences.

**{¶52}** Before imposing consecutive sentences, a trial court must make certain findings set forth in R.C. 2929.14(C)(4). It must find that consecutive sentences are "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C. 2929.14(C)(4). The court must also find any of the following:

> (a) The offender committed one or more of the multiple offenses

16

while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c). While a trial court must make the findings set forth in R.C. 2929.14(C)(4), it is not required to provide reasons in support thereof. *State v. Gill*, 2024-Ohio-2792, ¶ 45 (1st Dist.).

**{¶53}** In support of the imposition of consecutive sentences, the trial court stated,

I do specifically find that it is necessary to protect the public and/or punish the offender and not disproportionate to the seriousness of the offender's conduct and the danger the offender poses to the public.

I also find that the harm caused by two or more of the offenses was so great or unusual no single prison term for any offense committed as part of one or more courses of conduct would adequately reflect the seriousness of the offender's conduct. And the offender's criminal

17

history shows a need to protect the public.

> Mr. Turner does have an extensive criminal record. There's violence in that record. And obviously murder is about as violent as you can get.

**{¶54}** The trial court made the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences. Turner, however, contends that the trial court's proportionality finding was not supported by the record because, even if this court determines that he was the second passenger in the vehicle, there is no evidence in the record that he had or used a firearm. We disagree. As set forth in our analysis of Turner's first and second assignments of error, the sufficiency and the weight of the evidence established that Turner was the second passenger in McCary's vehicle, that Turner fired at A.Z. from the vehicle, and that Turner pursued A.Z. on foot while carrying a rifle. Turner was not merely present for these offenses, but actively participated in the hunt for and attack on A.Z.

**{¶55}** We cannot clearly and convincingly find that the record does not support the trial court's findings in support of the imposition of consecutive sentences. Turner's fourth assignment of error is overruled.

**{¶56}** The judgment of the trial court is accordingly affirmed.

Judgment affirmed.

**KINSLEY, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.