# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-250011 |
| | | TRIAL NO. B-2400481 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| REDEEMED HARDY, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 12/23/2025 per order of the court.**

**By:**_____
       **Administrative Judge**

[Cite as *State v. Hardy*, 2025-Ohio-5723.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                          :        APPEAL NO.   C-250011
                                                 TRIAL NO.    B-2400481
    Plaintiff-Appellee,            :

  vs.                                   :
                                                 *O P I N I O N*
REDEEMED HARDY,                         :

    Defendant-Appellant.           :



Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 23, 2025


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**CROUSE, Judge.**

{¶1} Defendant-appellant Redeemed Hardy appeals from the trial court's judgment convicting him, following a jury trial, of murder in violation of R.C. 2903.02(A) and an accompanying firearm specification.

{¶2} In three assignments of error, Hardy challenges the sufficiency and the weight of the evidence supporting his conviction and argues that he was denied the effective assistance of trial counsel. We find these arguments to be without merit and affirm the trial court's judgment.

## I. Factual and Procedural History

{¶3} On January 12, 2024, the body of a deceased individual was found in a crosswalk at the intersection of Reading Road and Stewart Place. The victim, D.B., had suffered multiple gunshot wounds.

{¶4} For his role in the events that led to D.B.'s injuries and death, an indictment was issued against Hardy charging him with (1) aggravated murder in violation of R.C. 2903.01(A), (2) murder in violation of R.C. 2903.02(A), (3) felony murder in violation of R.C. 2903.02(B), (4) felonious assault in violation of R.C. 2903.11(A)(1), and (5) felonious assault in violation of R.C. 2903.11(A)(2). Each count carried two accompanying firearm specifications alleging that Hardy had a firearm on or about his person while committing the charged offenses and that he displayed, brandished, indicated that he possessed, or used the firearm to facilitate the offenses.

{¶5} At the jury trial, Cincinnati Police Officer Edward Bedinghaus testified that, while on patrol on January 12, 2024, he was flagged down by a pedestrian who notified him that the body of a deceased person could be found on a nearby street. Officer Bedinghaus responded to the intersection of Reading Road and Stewart Place, where he saw a deceased male lying in the crosswalk. He could see that the deceased

had suffered a gunshot wound to the head. Officer Bedinghaus cordoned off the crime scene and called for backup.

{¶6} Cincinnati Fire Lieutenant Steven Sieving testified that he responded to the scene. He performed a rapid trauma assessment on the victim, noting that the victim had suffered a gunshot wound to the face and was not breathing upon the paramedic's arrival.

{¶7} Cincinnati Police Detective Carl Beebe testified that he investigated the homicide of D.B. He stated that because officers recovered multiple personal items from D.B.'s person, including money and jewelry, he did not believe that D.B. was killed during a robbery. Detective Beebe further stated that because officers did not find any shell casings at the scene, the suspected murder weapon was a revolver, as opposed to a semi-automatic pistol.

{¶8} During his investigation, Detective Beebe obtained video footage from various cameras on businesses, homes, and apartment buildings in the area, as well as from real-time crime cameras operated by the City of Cincinnati. The shooting of D.B. was captured, from a distance, by a camera attached to a nearby home. After viewing footage from these cameras, Detective Beebe identified an individual on the footage whom he believed to be the person who shot D.B. Detective Beebe testified that, using this footage, he tracked the movements of this individual both before and after the shooting. He compiled the various footage into a "court sequence video" that depicted the travel of the individual. This video was admitted and played at trial.

{¶9} As the video was played, the State paused it on multiple occasions for Detective Beebe to narrate what each camera sequence depicted and to explain where the camera that captured the footage was located. Detective Beebe testified that the individual whom he tracked was first caught on video exiting an apartment complex

located at 757 Ridgeway Avenue. Detective Beebe proceeded to describe this individual's route of travel, explaining that he determined that he was tracking the same individual in each camera sequence based on a reflecting light coming from the individual's right wrist in many of the sequences. He also relied on the individual's clothing, which he described as a matching camouflage top and bottom. Detective Beebe further explained, "We were looking at the shoes, at all parts of the shoe, including the bottom of the shoe. We were looking at the area between the pants and the top of the shoe. And we were looking at the build, the stature of that subject, and the way that subject moved and walked."

{¶10} Detective Beebe described the camera sequence that recorded the shooting of D.B., stating, "We saw one individual fall backwards, and then we see this individual here with an arm extended in a position consistent with a shooting stance." He testified that the individual that he was tracking returned to 757 Ridgeway after the shooting, where he "disappear[ed] somewhere beside the building." Shortly thereafter, a camera sequence depicted the individual in the interior stairwell of the building.

{¶11} Detective Beebe testified that the next camera sequence depicted the individual exiting the apartment building with a dog. The video footage showed that the individual was now wearing an orange sweatshirt and that he walked to the cordoned-off crime scene where D.B.'s body was found. Detective Beebe explained that the camera that captured this footage at the crime scene also had audio capabilities, and that it recorded an officer on the scene tell the individual that he could not walk through the area and ask the individual where he stayed. The individual responded, "757 Ridgeway." According to Detective Beebe, the camera sequences then depicted the individual returning to the apartment complex.

{¶12} Detective Beebe offered additional testimony about his investigation.

5

He stated that, on January 19, 2024, he and his partner drove to the Ridgeway apartment complex to look for a particular vehicle that the tracked individual accessed on the night of the shooting. They found the vehicle and discovered that it was registered to Hardy. Detective Beebe obtained a tenant list for the apartment complex and learned that Hardy was a tenant.

{¶13} Detective Beebe testified that officers obtained a search warrant for Hardy's apartment. During the warrant's execution on January 29, 2024, officers found a safe that held a Ruger GP100 firearm and a pair of gym shoes. Also recovered from the apartment were a pair of camouflage pants and a camouflage jacket, which were consistent with those worn by the individual in the court sequence video, two watches, and a group of keys. Detective Beebe stated that three of the keys unlocked the safe found in the apartment, the front door of the apartment, and Hardy's vehicle.

{¶14} Detective Beebe further testified that he interviewed Hardy. The recorded interview was admitted and played in court. During the interview, Hardy stated that he had left his house to walk his dog to a nearby store on the night that D.B. was shot. He saw the crime scene tape and was told by an officer that he could not walk through the area. Hardy stated that he had not left his apartment that evening prior to walking the dog. Hardy also told Detective Beebe during the interview that he was "cool" with D.B. and that the two had previously lived in a shelter at the same time. Hardy said that D.B. was the former boyfriend of Hardy's girlfriend D.P.

{¶15} On cross-examination, Detective Beebe testified that the safe recovered from Hardy's apartment contained multiple documents in the name of D.P., and that D.P. was present at the apartment when officers arrived to execute the search warrant.

{¶16} Criminalist Gianni Favro testified that she processed both the crime scene where D.B.'s body was found and Hardy's apartment. She described the various

6

evidence collected from the apartment, including (1) a pair of camouflage pants found on the bedroom floor; (2) a camouflage jacket found hanging on the back of the apartment's front door; (3) two .357 magnum shell casings found on a pantry shelf; (4) a box of Remington ammunition found in a tote bag in the hall closet; (5) two .357 magnum cartridges recovered from a dresser drawer in the bedroom; (6) two "speed loaders" found in an Amazon bag addressed to Hardy; (7) multiple gun holsters; (8) a wallet containing Hardy's ID; (9) two watches; (10) a set of keys; (11) a safe, found in the bedroom closet, that held a revolver, a pair of gym shoes, and personal paperwork; and (12) a 9 mm cartridge.

{¶17} Favro testified that the revolver held two full cartridges and four spent casings. She noticed a small amount of blood on the inside trigger on the revolver and swabbed it for testing. Favro also stated that she saw several spots on the camouflage jacket that she believed could be blood. She conducted a presumptive blood test, and when the results of that test were positive, she cut out the pocket of the jacket where the blood was found and separately packaged it for processing.

{¶18} Forensic pathologist Benjamin Criss testified that he conducted an autopsy on D.B. Criss stated that D.B. had suffered gunshot wounds to his head, chin, and left thigh. Criss recovered and collected for processing both a bullet from D.B.'s thigh and fragments from the bullet that struck D.B.'s head. Criss testified that D.B.'s cause of death was a gunshot wound to his head.

{¶19} The State presented testimony from multiple expert witnesses regarding the testing and processing of items recovered during the search of Hardy's apartment and D.B.'s autopsy. Hamilton County Firearms Examiner Bridget Chambers explained that her primary duty was to determine whether a bullet, a cartridge case, or other ammunition component was fired from a particular firearm.

Chambers testified that she examined the revolver recovered from Hardy's apartment and found it to be operable. She further testified that the two .357 magnum cartridge cases submitted for testing had been fired from that revolver, as had the bullet jacket recovered during the autopsy of D.B. But Chambers stated that, due to the small size of the bullet fragments recovered during the autopsy, she was unable to determine if they had been fired from the revolver.

{¶20} Trace evidence examiner Annalise Murphy testified that she examined the camouflage jacket collected in this case, and that it tested positive for the presence of gunshot residue. Murphy explained that this positive finding indicated either that the jacket had been in the vicinity of a firearm when it was discharged or that gunshot residue had been transferred to it.

{¶21} Forensic biologist Mary Barger testified that she performed a DNA analysis on multiple items collected during the search of Hardy's apartment. Barger testified that she obtained a partial DNA profile from the trigger of the submitted revolver, but that the profile was not sufficient to make an identification. Barger also tested the blood found on the trigger guard of the revolver. The DNA profile obtained from that blood matched Hardy. Barger further testified she obtained a DNA profile matching Hardy from the submitted swatch from the camouflage jacket. Barger stated that she found DNA from a second individual on the swatch as well, but that it had not been sufficient to make an identification. On cross-examination, Barger testified that at least three people had contact with the revolver.

{¶22} The State also presented testimony from D.B.'s sister, L.T. She testified that she and D.B. were very close, and that, at the time of his death, D.B. was on a good path and had turned his life around.

{¶23} Hardy elected not to testify and did not present any witnesses.

{¶24} The jury acquitted Hardy of aggravated murder but found him guilty of the remaining offenses and their accompanying firearm specifications. At sentencing, the trial court merged the offenses of felony murder in violation of R.C. 2903.02(B) and felonious assault in violation of both R.C. 2903.11(A)(1) and (A)(2) into the offense of murder in violation of R.C. 2903.02(A). It also merged the first firearm specification accompanying the murder conviction into the second firearm specification. The trial court imposed a sentence of 15 years' to life imprisonment for the offense of murder, along with a consecutive three years of imprisonment for the firearm specification, resulting in an aggregate term of 18 years' to life imprisonment.

{¶25} Hardy now appeals.

## II. Sufficiency and Weight of the Evidence

{¶26} In his first and second assignments of error, Hardy argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. We address these assignments together.

{¶27} Hardy challenges the sufficiency and the weight of the evidence supporting all four offenses for which the jury returned guilty verdicts. But, as previously explained, the two felonious-assault offenses and the offense of felony murder in violation of R.C. 2903.02(B) were merged at sentencing into the offense of murder in violation of R.C. 2903.02(A), and no sentences were imposed for those three offenses. Absent the imposition of sentence, Hardy was not convicted of the offenses. *See State v. Turner*, 2025-Ohio-386, ¶ 26 (1st Dist.). "And in the absence of a judgment of conviction, 'we do not consider a challenge to the sufficiency or the weight of the evidence' with respect to the merged offenses." *Id.*, quoting *State v. Cooper*, 2019-Ohio-2813, ¶ 15 (1st Dist.). Accordingly, we only review the sufficiency and weight of the evidence of Hardy's conviction for murder in violation of R.C.

9

2903.02(A).

**{¶28}** A challenge to the sufficiency of the evidence requires us to determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Cleaned up.) *State v. Walker*, 2016-Ohio-8295, ¶ 12. In contrast, when this court reviews a challenge to the manifest weight of the evidence, it must "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 25.

**{¶29}** Hardy was convicted of murder in violation of R.C. 2903.02(A), which provides in relevant part that "[n]o person shall purposely cause the death of another." In support of his argument that this conviction was not supported by the sufficiency or weight of the evidence, Hardy contends that there were no eyewitnesses to the offense, that the State's video evidence was of poor quality, and that neither the video evidence nor the items discovered during the search of his apartment were sufficient to establish his identity as the perpetrator of the offense.

**{¶30}** We agree with Hardy that much of the video footage played for the jury was of poor quality. Detective Beebe testified that he primarily relied on camouflage clothing and a reflective light coming from the depicted individual's wrist to determine that the same individual appeared in each camera sequence. But these features are not identifiable in every video sequence, including the sequence depicting the actual shooting. After having viewed the video, we cannot say with any certainty that the same individual appears in each sequence.

**{¶31}** While the value of the video footage is questionable, the record contains

ample other evidence to support Hardy's conviction. The State presented testimony that the revolver found in the safe in Hardy's apartment fired the bullet recovered from D.B.'s body and the two .357 magnum cartridge cases found in Hardy's apartment. Further, Hardy's DNA was found on the trigger guard of the revolver and the camouflage jacket recovered from his apartment. The jacket also tested positive for gunshot residue.

{¶32} Much of the evidence in this case is circumstantial, but that does not render the evidence any less valuable. *See State v. Morrissette*, 2018-Ohio-3917, ¶ 27 (1st Dist.) ("[C]ircumstantial evidence inherently possesses the same probative value as direct evidence."). Viewing in the light most favorable to the prosecution the facts that (1) an individual wearing camouflage clothing was walking near the scene of the shooting at the time that the shooting occurred, (2) a pair of camouflage pants and a camouflage jacket were found in Hardy's apartment, (3) the camouflage jacket tested positive for gunshot residue, (4) the revolver found in Hardy's safe fired the bullets that killed D.B., and (5) Hardy's DNA was recovered from the weapon and the camouflage jacket, the jury could reasonably have inferred that Hardy was the individual who shot D.B. and found the elements of the offense proven beyond a reasonable doubt. *See Walker*, 2016-Ohio-8295, at ¶ 12. This evidence was therefore sufficient to support Hardy's conviction.

{¶33} With respect to the manifest weight of the evidence, Hardy argues that the search for physical evidence in this case was flawed because the search took place 17 days after the shooting. He further directs this court to the evidence that was presented establishing that he walked his dog to the scene of the homicide and spoke with an officer. Relying on that evidence, he argues that "[i]t seems unrealistic to conclude that he left his apartment, went to the crime scene, engaged with an officer,

11

and g[ave] his address had he actually been involved in the murder."

**{¶34}** We are not persuaded. The jury was aware that the search of Hardy's apartment took place approximately 17 days after D.B. was shot. It was able to consider that information when determining what weight to accord the search and the items recovered. As for Hardy's latter argument, the jury could reasonably have found that Hardy, after changing his clothes, returned to the crime scene to see if the body had been discovered and to glean information about the investigation. This was not the rare case in which the jury lost its way and committed a manifest miscarriage of justice in convicting Hardy. *See Powell*, 2020-Ohio-4283, at ¶ 16 (1st Dist.).

**{¶35}** The first and second assignments of error are accordingly overruled.

### III. Ineffective Assistance

**{¶36}** In his third assignment of error, Hardy argues that he was denied the effective assistance of trial counsel.

**{¶37}** Counsel will not be considered constitutionally ineffective unless her or his performance was deficient and caused actual prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989). Counsel's performance will only be deemed deficient if it fell below an objective standard of reasonableness. *Strickland* at 687-688; *Bradley* at 142. A reviewing court must indulge a presumption that counsel's behavior fell within the acceptable range of reasonable professional assistance. *Strickland* at 689; *Bradley* at 142. A defendant is only prejudiced by counsel's performance if there is a reasonable probability that the outcome of the proceedings would have been different but for the deficient performance. *Strickland* at 694; *Bradley* at 142.

**{¶38}** Hardy was represented by two attorneys at trial. He argues that his trial counsel were ineffective for failing to move for a mistrial after a juror saw him in

handcuffs, failing to cross-examine witnesses, and failing to engage expert testimony. We address each contention in turn.

### A. Failure to Move for a Mistrial

**{¶39}** We begin with Hardy's contention that his trial counsel were ineffective for failing to move for a mistrial after a juror saw him in handcuffs. He contends that allowing the juror to see him in handcuffs had a prejudicial impact against the presumption of innocence.

**{¶40}** On the morning of the fourth day of Hardy's trial, defense counsel informed the trial court that Hardy told them that a juror had seen him in handcuffs the previous day when the deputies had escorted him from the courtroom. The following exchange took place:

Court: Okay. And this was in the back hallway?

Hardy: Yes.

Court: All right. While we do try to avoid that, unfortunately the physical setup here is such that the hallway -- and this is helpful for anyone reviewing this later on the record. The hallway that leads to the transport for folks in the Justice Center is a shared hallway with my jury room. And so the intent is that, when there's a situation like this, we make sure the jury has all left before the defendant is moved through the hall. It sounds like that may have overlapped unintentionally yesterday. And you say it's just one juror, right?

Hardy: Yes.

Court: All right. Well, I don't know what we can do about it. Do you think there's some prejudice as a result of that? You do?

Defense Counsel: There is. And, I guess, we could ask for a—I

13

guess a special instruction. Although, I think sometimes that also brings more attention to the issue, so—

Court: Well, I've not dealt with this before, but it seems to me there's a couple of options. One would be an instruction. Two, if we knew which juror it was would be to talk to the juror on the record, outside the presence of the rest of the jury, to see if the juror was aware of that. Three would be to do nothing, to not make a bigger deal out of it than it would be. And, four, if you do think you're prejudiced, you have a motion you can make and I'll consider it. Those are the options that off the top my head come out. I don't know if there's others.

Defense Counsel: I think at this time I would rather do nothing. And maybe on the next break I can discuss it with [fellow defense counsel] and Mr. Hardy and decide if we'd like to question the individual juror to see if she feels that she's somehow prejudiced by seeing this. You know, just make sure she doesn't discuss it with the other jurors, but, like I said, sometimes I think it's better to do nothing because it can raise the issue and bring more attention to it than was warranted.

Court: I saw [the prosecutor] straining.

State: Thank you, Judge. If I'm hearing this right, he's claiming that the deputy is also agreeing with him that this juror saw him? So I think we should bring in that deputy just to flesh out the facts of the allegation.

{¶41} Subsequent to this exchange, the trial resumed. But during a break in trial, the parties returned, outside of the presence of the jury, to the issue of a juror

potentially having seen Hardy in handcuffs. The record reflects that the following discussion occurred:

Court: So we're on the record outside the presence of the jury. And we have the benefit of having several sheriff's deputies present, including—is it both deputies who were escorting the defendant yesterday afternoon? Both of you are here? All right. Appreciate you coming up. It's my understanding that, [defense counsel], you've had a chance to talk directly to these deputies and discuss with them what their recollection is; is that right?

Defense Counsel: That's correct, Judge.

Court: And do you want to recount that for the record?

Defense Counsel: I can do that or, instead of me speaking for them, if they want to say what they saw, I'm fine with that as well.

. . .

Deputy Henderly: So when the jury got dismissed, they went back to the jury room. We stayed in here for a few minutes with the defendant. Deputy Myer had control of the inmate. I walked in the back hallway here to see if there were any jury members still in there and there were. So Adam went back to the jury room to make sure everybody was clear in that back hallway. I had peeked my head out into the main hallway and there was one juror leaving going around the corner to go— to head out. Once she had got—cleared the hallway, I waited probably ten, fifteen seconds before I told Deputy Myer to bring him out. As soon as we brought the defendant out, the juror had come back around the corner and backtracked towards the back hallway.

Court: So she went the wrong way?

Deputy Henderly: Correct. I only saw the juror for a split second, but I said let's just make our way towards the stairwell until we get him back down to our office. That way not to make a big scene. So I'm not sure if the juror saw him in cuffs. I know the juror probably saw all three of us in the hallway. Whether or not he saw the inmate in cuffs or not, I am not sure.

Court: Is this a male juror or female juror?

Deputy Henderly: I believe it was a male juror.

Court: A male juror. All right. Nothing to say, right?

Deputy Myer: Nothing to say.

Court: And it was just a passing in the hallway, yes?

Deputy Henderly: Correct.

Court: And the defendant was in cuffs?

Deputy Henderly: He was in cuffs.

Court: All right. Appreciate that. [Defense counsel.]

Defense Counsel: Judge, I think it's somewhat unclear which juror this may have been, and it was only for a glancing second it sounds like. So I've spoken to co-counsel and Mr. Hardy. And I think, instead of drawing attention to it, trying to figure out which juror this even was—we have some suspicion on who it was—I think it's better just to leave it be and not draw any additional attention to it. So we are not going to ask the Court to take any further action at this time. I've discussed that with Mr. Hardy, and he's fine with that as well.

Court: I'm going to take that as a waiver then. Do you

16

understand?

> Defense Counsel: I understand, Judge.

> Court: If you so wanted, I will give an instruction and talk to the juror in chambers with you present if you wanted to. All those things are possibilities, but if that's your decision, then we will accept it, okay?

**{¶42}** On this record, we cannot agree that defense counsel were ineffective for failing to move for a mistrial. First, the record does not definitively reflect that the juror actually saw Hardy in handcuffs. Deputy Henderly testified that the juror clearly saw Hardy with two deputies, but that he was unsure whether the juror could see that Hardy was handcuffed. Nor does the record reflect that the parties definitively knew which juror was involved.

**{¶43}** Second, defense counsel indisputably took this issue seriously and considered the potential ramifications of all available options when deciding how to proceed. Defense counsel immediately brought the issue to the court's attention and questioned the deputies as to what, in fact, had occurred. Counsel weighed the impact of raising this issue with any of the jurors, especially since they were unsure which juror saw Hardy, and ultimately determined that doing so could cause additional harm. Under these circumstances, the performance of defense counsel did not fall below an objective standard of reasonableness.

### B. Failure to Cross-Examine Witnesses

**{¶44}** Hardy next argues that his trial attorneys were ineffective for failing to cross-examine "important" witnesses, specifically D.B.'s sister L.T., Officer Bedinghaus, and Lieutenant Sieving.

**{¶45}** "Trial counsel need not cross-examine every witness. The strategic decision not to cross-examine witnesses is firmly committed to the trial counsel's

judgment." (Cleaned up.) *State v. Dean*, 2015-Ohio-4347, ¶ 272.

**{¶46}** Hardy argues that his trial counsel should have questioned L.T. about D.B.'s living arrangements and if D.B. had a prior relationship with Hardy, that they should have asked Officer Bedinghaus about how D.B.'s body was positioned when the officer arrived at the scene and if any other persons had been present, and that they should have questioned Lieutenant Sieving about D.B.'s various wounds and injuries.

**{¶47}** We hold that trial counsel were not ineffective for failing to cross-examine these witnesses. The only disputed issue at trial was the identity of the person who shot D.B. Information regarding D.B.'s wounds and injuries, as well as the positioning of his body at the scene, were not relevant to determining the perpetrator's identity. Further, the record contained detailed testimony from the forensic pathologist regarding the injuries that D.B. had suffered. The record also contained evidence—specifically, statements made by Hardy during his interview with Detective Beebe—regarding the nature of the relationship between D.B. and Hardy, including that they had previously lived in a shelter at the same time and that D.B. was an ex-boyfriend of Hardy's girlfriend. Counsel, therefore, were not deficient in failing to cross-examine these witnesses.

### C. Failure to Engage an Expert

**{¶48}** Hardy last argues that his counsel were ineffective for failing to engage an expert witness in crime scene reconstruction. He contends that their failure to put on at least some expert evidence to discredit the State's theory that he shot D.B. was not a reasonable tactical decision, and that a crime scene reconstructionist could have examined the video evidence and shown that he was engaged in other activities at the time of the shooting.

**{¶49}** Generally, the failure to call an expert witness is a matter of trial strategy

and does not constitute ineffective assistance. *State v. McHenry*, 2018-Ohio-3383, ¶ 25 (1st Dist.). On this record, particularly where the video evidence was of such poor quality and where counsel argued to the jury that it was impossible to determine who the individuals depicted in the court sequence video were, we cannot say that counsel were deficient for failing to engage a crime-scene-reconstruction expert to examine the video evidence. Further, any testimony that such an expert would have offered is purely speculative. As such, on this record, Hardy cannot demonstrate a reasonable probability that the outcome of the proceedings would have been different had defense counsel engaged an expert in crime scene reconstruction to examine the video evidence. *See id.*

{¶50} We hold that Hardy did not receive ineffective assistance from his trial counsel and overrule the third assignment of error. The judgment of the trial court is, accordingly, affirmed.

Judgment affirmed.

**KINSLEY, P.J.,** and **ZAYAS, J.,** concur.